NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JEREMY JOSEPH DAVIS, | : |
| | : Hon. Faith S. Hochberg, U.S.D.J. |
| Plaintiff, | : |
| | : Civil Action No. 07-2135 |
| v. | : |
| | : **OPINION** |
| STEPHEN E. EGBERT, *et al.*, | : |
| | : June 7, 2010 |
| Defendants. | : |

**HOCHBERG, District Judge**:

Plaintiff Jeremy Joseph Davis brings this action against FBI Special Agents Stephen E. Egbert, William J. Edge, Jr., and Mark Allan Corrice (together, the "FBI Defendants"), and against Pennsylvania police officers Christie Beers Correa and Todd Frey, asserting federal civil rights claims arising out of his arrest in June 2005. Presently before the Court are two motions for summary judgment, one filed by the FBI Defendants, and one by Officers Correa and Frey. The Court has considered the motions on the papers pursuant to Federal Rule of Civil Procedure 78.

**I. Facts & Procedural History**

The following facts are undisputed, except where noted otherwise:

In July 2004, Plaintiff Jeremy Joseph Davis was arrested in Pennsylvania by Defendant Christie Beers Correa of the Allentown Police Department ("Officer Correa"), and charged with two felonies related to the distribution of heroin and cocaine. While those charges were pending, Plaintiff was released from custody pursuant to a cooperation agreement with the local

1

prosecutor's office. Thereafter, Plaintiff violated the conditions of his release by failing to appear for a mandatory court date. Consequently, two bench warrants were issued for Plaintiff's arrest.

In late May 2005, Officer Correa learned of Plaintiff's whereabouts. Plaintiff's girlfriend reported to Officer Correa that Plaintiff was residing with her in an apartment located at 92-94 West Allen Street, in Irvington, New Jersey. Plaintiff's girlfriend provided this information in an effort to cooperate with authorities in light of her own pending criminal charges. Officer Correa immediately contacted Defendant Stephen E. Egbert ("Agent Egbert"), an FBI Special Agent and member of the U.S. Marshal's Service New York/New Jersey Regional Fugitive Apprehension Task Force (the "Fugitive Task Force") to arrange for Plaintiff's arrest.

In the early hours of June 1, 2005, Agent Egbert headed a briefing with other law enforcement officers, including FBI Special Agents William J. Edge, Jr. ("Agent Edge") and Mark Allan Corrice ("Agent Corrice"), Detective Patrick Corcoran of the Newark Police Department ("Detective Corcoran"), Officer Correa, Officer Todd Frey of the Allentown Police Department ("Officer Frey"), and a number of Deputy U.S. Marshals, to discuss the plan for Plaintiff's arrest. After the briefing, the group traveled to Plaintiff's apartment building. Plaintiff's apartment unit was on the ground floor of the building, and had front and back doors that opened into common hallways.

At approximately 5:30 a.m., Agent Egbert and Agent Edge approached the front door of the apartment building. Agent Egbert knocked on the common door for a period of time without any response. After becoming aware of the back door, several officers – including Agent Egbert, Agent Edge, and a few Deputy U.S. Marshals – went to the rear entrance. Agent Corrice remained stationed outside the front of the building. Officer Correa and Officer Frey were

assigned to the rear perimeter of the building, and were kept away from the arrest because they were not New Jersey police officers.

Agent Egbert testified that he knocked on the rear door and announced the officers' presence. Agent Edge testified that he announced "Police!," called out Plaintiff's name, and asked for someone to open the door. Plaintiff testified that he heard banging on the back door and commands to open the door, but did not hear anyone announce "Police." Plaintiff further testified that he panicked upon hearing these noises, fearing that anyone coming through the door could harm him.

Agent Egbert, Agent Edge, and Detective Corcoran testified that after a period of knocking, a black male opened the back door but immediately slammed it shut; a fact that Plaintiff denies. It is undisputed that Plaintiff and his brother, who was also staying at the apartment, then attempted to barricade the back door by moving a refrigerator in front of it. While his brother braced the refrigerator against the back door, Plaintiff then attempted to flee through the front door.

Meanwhile, the officers at the back door heard loud noises from within the residence, which they correctly perceived to be an attempt to barricade the door. Agent Egbert believed that Plaintiff could be obtaining a weapon or trying to put up additional barricades, and, sensing a heightened danger level, decided it was necessary to breach the door. Because of the barricade, the officers could only open the door a few inches.

Agent Egbert was the first to enter the apartment through the narrow gap. Once inside, Agent Egbert encountered Plaintiff's brother, who was trying to push the refrigerator against the door. Agent Egbert subdued and handcuffed Plaintiff's brother. As he was handcuffing Plaintiff's brother, Agent Egbert saw Plaintiff running toward the front door of the apartment.

3

Agent Egbert ordered Plaintiff to stop and show his hands, but Plaintiff did not comply. Agent Egbert then yelled to other officers for assistance.

From here, Plaintiff's and Defendants' version of events diverge. According to Defendants, Detective Corcoran was the next officer to enter the apartment through the back door. Once inside, Detective Corcoran observed Agent Egbert handcuffing Plaintiff's brother, and Plaintiff trying to flee the apartment through the front door. Detective Corcoran testified that he then ran to Plaintiff and jumped on his back in an attempt to pull him away from the front door. Detective Corcoran further testified that while he was on Plaintiff's back, Plaintiff, who is much larger in physical build than the officers,[1] threw him around like "a rag doll."

Agent Edge, the next officer to enter through the back door, testified that he attempted to help Detective Corcoran apprehend Plaintiff. Agent Edge, Agent Egbert, and Detective Corcoran testified that Plaintiff resisted, flailed his arms, and threw his elbows. The officers testified that despite their attempts to subdue him, Plaintiff managed to open the front door, but then fell face first into the hallway outside the apartment. Detective Corcoran testified that after Plaintiff fell to the floor, he continued to struggle. Detective Corcoran told Plaintiff he would have to spray him with mace unless he stopped resisting, at which point Plaintiff complied and was handcuffed.

Plaintiff does not dispute that he was trying to get away from the apartment. His version of the events is that, when he managed to open the front door, he ran into a "big guy" with a "U.S. Marshal badge hanging around his neck" in the hallway.[2] At that point, an officer jumped

---

[1] At the time of the arrest, Plaintiff was six feet, three inches tall, and weighed between 250 and 260 pounds. Detective Corcoran was five feet, eight inches tall, and weighed approximately 195 pounds. Agent Edge was five feet, eight inches tall, and weighed approximately 175 pounds.

[2] In his opposition papers, Plaintiff identifies this "big guy" as Detective Corcoran. Defendants dispute that any law enforcement officer was in the hallway outside the front door.

4

on his back,[3] and hit him on the head with a metal object, which he did not see but surmised to be a flashlight. Plaintiff testified that he was struck with this object several times "very fast, hard." At about the same time, Plaintiff's foot was stomped on. Plaintiff further testified that seconds after he was hit, the unidentified "big guy" "grabbed whoever was on my back and pushed him off." Once Plaintiff fell to the ground, an officer placed Plaintiff in handcuffs. Plaintiff denies physically flailing his arms in an effort to get the officer off of his back.

It is undisputed that while these events were transpiring, Officer Frey and Agent Corrice remained outside the building. They had no physical contact with Plaintiff and did not witness the struggle to apprehend Plaintiff. Officer Correa testified that she did not enter Plaintiff's apartment until after Plaintiff had been subdued and secured. Plaintiff's girlfriend testified that Officer Correa was present in the apartment's bedroom in about "a second" after the other officers entered the residence, and that Officer Correa was in the bedroom with her while the struggle with Plaintiff was occurring near the front door. Plaintiff's brother likewise testified that he saw a female officer enter the apartment after the back door was breached.

During the arrest, Plaintiff sustained a cut under his hairline. He also bruised a toe, causing damage to his toenail. Plaintiff testified that he was visibly bleeding onto his shirt shortly after he was handcuffed. Although Agent Egbert testified that he recalled seeing some blood on Plaintiff's shirt at the scene of the arrest, he did not observe a wound or any active bleeding. Agent Egbert asked Plaintiff if he needed to go to the hospital, but Plaintiff answered, "no," and said that he was "okay."

Plaintiff was led out of his residence and placed in the FBI Defendants' vehicle. Plaintiff testified that as he was being led to the vehicle, Officer Correa said to him, "I told you we would

---

[3] Plaintiff testified at his deposition that he did not know who latched onto his back. In his opposition papers, he argues that the officer was Agent Edge.

5

get your black ass." Officer Correa denies having made this remark to Plaintiff, and all other Defendants deny that she made such remark to Plaintiff in their presence.

After a short time, Agent Edge and Agent Egbert transported Plaintiff to Essex County Jail. The intake officer at the jail noticed the blood on Plaintiff's shirt and informed Agent Edge and Agent Egbert that medical clearance was required before Plaintiff could be admitted to the prison. Plaintiff was subsequently transported to University Hospital in Newark by Agent Edge and Agent Corrice. Agent Corrice testified that this was the first time he became aware of an injury to Plaintiff.

About three-and-a-half hours after the arrest, at 9:20 a.m., Plaintiff's cut was cleaned and he received approximately eight to ten stitches on his head. Plaintiff told the treating physician that he had been hit on the head with a flashlight. The wound to his foot was also treated and wrapped. Plaintiff was given ibuprofen for pain and was discharged.

Plaintiff was then admitted to Essex County Jail. While incarcerated, Plaintiff received treatment for his head and toe injuries, including daily foot soaks and Motrin for pain. Plaintiff subsequently developed keloids in the area of his head laceration, which continue to cause him pain.

Plaintiff, initially appearing *pro se*, instituted this action in May 2007. His original Complaint named as defendants two unknown agents of the FBI, one unknown agent of the U.S. Marshal's Service, two unknown officers of the Allentown Police Department, and Officer Correa. After receiving discovery from Officer Correa, Plaintiff was granted leave to file an Amended Complaint, in which he substituted the names of the FBI Defendants for the unknown

FBI agents, Officer Frey's name for the unknown Allentown Police Department Officer, and Detective Corcoran's name for the unknown agent of the U.S. Marshal's Service.[4]

The Amended Complaint alleges several constitutional violations by Defendants in their individual capacities. Specifically, as clarified in the Final Pre-Trial Order,[5] Plaintiff alleges that (1) Defendants' "unnecessary and unwarranted forceful entry" into Plaintiff's residence violated his Fourth Amendment rights; (2) Agent Edge's use of excessive force in effectuating his arrest violated his Fourth Amendment rights; (3) Agent Egbert and Officer Correa failed to intervene in Agent Edge's use of excessive force in violation of Plaintiff's Fourth Amendment rights; (4) Agent Edge, Agent Egbert, and Agent Corrice demonstrated deliberate indifference to his serious medical needs in violation of his Fifth, Eighth, and Fourteenth Amendment rights; and (5) Officer Correa's "callous racial remarks" violated Plaintiff's "constitutional rights." Plaintiff seeks enforcement of these constitutional rights under 42 U.S.C. § 1983.[6]

Defendants now move for summary judgment on all claims. Plaintiff concedes in his opposition papers that summary judgment should be entered in favor of Officer Frey. The uncontroverted evidence shows that Officer Frey never entered Plaintiff's apartment, and therefore did not participate in or observe Plaintiff's arrest. It is further undisputed that Officer Frey had no contact with Plaintiff following the arrest, and was unaware that he suffered an injury. The Court will, therefore, grant Officer Frey's motion for summary judgment. *See*

---

[4] Detective Corcoran was named as a Defendant in the Amended Complaint, but was never served by Plaintiff, even after counsel was appointed to represent him and the case proceeded through discovery to its Final Pre-Trial Conference. The Court will therefore dismiss this action as against Detective Corcoran. *See* Fed. R. Civ. P. 4(m).

[5] It is well established that the Final Pre-Trial Order supersedes all prior pleadings. *Price v. Inland Oil Co.*, 646 F.2d 90, 95 (3d Cir. 1981).

[6] Section 1983 "is not itself a source of substantive rights," *Graham v. Connor*, 490 U.S. 386, 393-94 (1989), but instead "provides a remedy for deprivation of rights established elsewhere in the Constitution." *Kopec v. Tate*, 361 F.3d 772, 776-77 (3d Cir. 2004).

7

*Anchorage Assoc. v. Virgin Islands Bd. of Tax Rev.*, 922 F.2d 168, 175 (3d Cir. 1990) (where summary judgment unopposed, Court must nonetheless "determine whether summary judgment is appropriate – that is, whether the moving party has shown itself to be entitled to judgment as a matter of law"). The claims as to the remaining Defendants will be discussed in turn.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c), a motion for summary judgment will be granted when the evidence contained in the record, including "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A fact is material if it might affect the outcome of the case, and an issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007). In deciding whether there are any disputed issues of material fact that must be reserved for trial, the Court must view the record, together with all reasonable inferences that can be drawn there from, in the light most favorable to the nonmoving party. *Peters v. Del. River Port Auth.*, 16 F.3d 1346, 1349 (3d Cir. 1994).

The party seeking summary judgment bears the initial burden of production. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). This burden requires the moving party to establish either that there is no genuine issue of material fact and that the moving party must prevail as a matter of law, or demonstrate that the nonmoving party has not shown the requisite facts relating to an essential element of an issue on which it bears the burden. *Id.* at 322-23. This burden can

be "discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the party seeking summary judgment has carried this initial burden, the burden shifts to the nonmoving party. To avoid summary judgment, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must demonstrate facts supporting each element for which it bears the burden, thus establishing the existence of a genuine issue of material fact justifying trial. *Serbin v. Bora Corp.*, 96 F.3d 66, 69 n.2 (3d Cir. 1999). If the non-movant's evidence on an essential element is merely "colorable" or is "not significantly probative," the Court must enter summary judgment in favor of the moving party. *Anderson*, 477 U.S. at 249-50; *see also Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991) (observing that non-movant's effort to defeat summary judgment may not "rest upon mere allegations, general denials, or . . . vague statements").

### B. Qualified Immunity

Defendants' motions for summary judgment assert qualified immunity. The doctrine of qualified immunity is intended to shield law enforcement officers from civil liability for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzpatrick*, 457 U.S. 800, 818 (1982). Because qualified immunity "is an *immunity from suit* rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in original), it should be resolved at the earliest possible stage in the litigation. *See Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (noting that the "driving force" behind the creation of qualified immunity was to ensure that unsupported claims

9

are resolved early). In this case, full discovery was completed before the motions asserting qualified immunity were made.

To determine whether an officer is entitled to qualified immunity, the Third Circuit, following *Saucier v. Katz*, 533 U.S. 194, 201 (2001), has employed a two-step inquiry: In step one, the Court must determine whether the facts, viewed in the light most favorable to plaintiff, establish a constitutional violation. *Curley v. Klem*, 298 F.3d 271, 277-78 (3d Cir. 2002). "If the plaintiff fails to make out a constitutional violation, the qualified immunity inquiry is at an end; the officer is entitled to immunity." *Bennett v. Murphy*, 274 F.3d 133, 136 (3d Cir. 2002). If, however, "a violation could be made out on a favorable view of the parties' submissions, the next sequential step is to ask whether the right was clearly established." *Saucier*, 533 U.S. at 201. In other words, the Court must determine whether, in the factual scenario established by the plaintiff, a reasonable officer would have understood that his actions were prohibited. *Bennett*, 274 F.3d at 136. "If it would not have been clear to a reasonable officer what the law required under the facts alleged, then he is entitled to qualified immunity." *Kopec*, 361 F.3d at 776. If, however, the requirements of the law would have been clear, the officer must stand trial.[7]

Recently, the Supreme Court eliminated the requirement that *Saucier*'s two steps be analyzed in sequential order, holding that courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 129 S. Ct. at 818.

---

[7] The determinations at both steps are questions of law for the Court to decide, but any disputed issues of historical fact relevant to the Court's determinations must be submitted to the jury. *Curley*, 298 F.3d at 278. In other words, "the standard for granting or denying a motion for summary judgment does not change in the qualified immunity context." *Id.* at 282.

### C. Unlawful Entry

Defendants move for summary judgment on Plaintiff's claim that his arrest violated his Fourth Amendment rights due to "Defendants' unnecessary and unwarranted forceful entry into [his] residence." Plaintiff has not opposed Defendants' motion for summary judgment on the unlawful entry claim, nor has he listed this claim as a legal issue for trial in the Final Pre-Trial Order. The unopposed motion will be granted. It is well settled that a law enforcement officer may enter a suspect's residence to make an arrest with an arrest warrant if the officer has probable cause to believe that the suspect "(1) live[s] in the residence, and (2) is within the residence at the time of entry." *United States v. Veal*, 453 F.3d 164, 167 (3d Cir. 2006). Here, it is undisputed that Defendants had a warrant for Plaintiff's arrest. Plaintiff does not oppose Defendants' contention that they had probable cause to believe both that Plaintiff resided at the apartment, and was actually there at the time of the arrest. Finally, Defendants were aware that Plaintiff was a fugitive who might be attempting to conceal his location. *See United States v. Magluta*, 44 F.3d 1530, 1538 (11th Cir. 1995) ("officers were entitled to consider that [arrestee] was a fugitive from justice . . . who might have been concealing his presence"). The totality of this undisputed evidence demonstrates that Defendants had probable cause to enter Plaintiff's apartment to arrest him. Plaintiff has not established any constitutional violation; Defendants are therefore entitled to qualified immunity on this unopposed claim.

### D. Excessive Force

Plaintiff contends that Agent Edge used excessive force in effectuating his arrest. Claims of excessive force by a police officer are evaluated under the Fourth Amendment's "objective

11

reasonableness" standard.[8] *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004); *Bornstad v. Honey Brook Twp.*, 211 F. App'x. 118, 123 (3d Cir. 2007). This standard requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citations omitted). "Other relevant factors include the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effectuating an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997).

Courts must judge the reasonableness of an officer's use of force "from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight," and must bear in mind "that police officers are often forced to make split second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. The Supreme Court has recognized that the right to make an arrest "carries with it the right to use some degree of physical coercion or threat thereof to effect it," and that "[n]ot every push or shove violates the Fourth Amendment." *Id.* at 396.

Here, Plaintiff asserts that Agent Edge jumped on his back and hit him on the head with a metal object, causing a laceration under his hairline. Agent Edge, and all other officers present at the time of the arrest, dispute that Plaintiff was struck on the head and all contend that the cut was caused when Plaintiff fell to the floor during the arrest skirmish. The officers also dispute

---

[8] Although Plaintiff cites the Eighth Amendment in his Complaint, excessive force claims arising out of an arrest are properly analyzed under the Fourth Amendment. *Graham*, 490 U.S. at 395 n.10; *Lora-Pena v. F.B.I.*, 529 F.3d 503, 505 (3d Cir. 2008).

12

that it is was Agent Edge who jumped on Plaintiff's back; Detective Corcoran testified that he was the one who latched onto Plaintiff, not Agent Edge, and Plaintiff himself testified that he did not know which officer hit him. In order to decide whether qualified immunity is warranted, it is unnecessary for a jury to resolve whether Plaintiff's minor laceration was the result of a fall or from being struck. In the fast-paced and potentially dangerous circumstances that confronted Agent Edge and the other members of the Fugitive Task Force, reasonable law enforcement officers would not have clearly understood that non-lethal force to apprehend a fleeing felon would be a constitutional violation.

Plaintiff concedes that at the time of the arrest, he was a fugitive: he had violated the terms of his release and had fled to New Jersey rather than face charges for drug-related felonies. He was therefore legally subject to arrest for multiple serious crimes. These undisputed facts also establish a reasonable basis for the Fugitive Task Force officers to believe that Plaintiff presented a continuing flight risk. Plaintiff also concedes that, upon hearing the loud knocks on his door, he barricaded the back door to prevent them from entering. This barricade attempt reasonably created a heightened sense of urgency and danger for the officers, who reasonably believed that Plaintiff may have been attempting to buy himself time to obtain a weapon. Moreover, it is uncontested that as the officers were entering the apartment, Plaintiff was running toward the front door to flee, ignoring Agent Egbert's instructions to stop and show his hands.[9]

From these undisputed facts, a reasonable officer in Agent Edge's position could conclude that Plaintiff – a known fugitive who had tried to barricade the door and who had run to exit the apartment – was attempting to evade arrest. Agent Edge thus needed to make a split-

---

[9] The fact that Plaintiff testified that he was attempting to leave his apartment to seek help from a neighbor because he believed he was the victim of a home invasion is immaterial. As noted above, the Court must judge the events from the perspective of an officer at the scene, not from the perspective of Plaintiff. *See Graham*, 490 U.S. at 396.

second decision about how to subdue a fleeing felon, who outweighed him by 75 pounds, who was half a foot taller, who had not complied with officer's verbal commands, and who he perceived to be striking out with his elbows. Even if Plaintiff's version of the facts of the skirmish were assumed *arguendo* to be credible, a reasonable officer confronted with these circumstances could reasonably conclude that striking Plaintiff in order to prevent his escape was warranted and lawful. Accordingly, qualified immunity bars suit against Agent Edge for excessive force, and summary judgment on this claim is granted.

### E. Failure to Intervene

In a related claim, Plaintiff alleges that Agent Egbert and Officer Correa violated his Fourth Amendment rights by failing to intervene in Agent Edge's use of force against him. An officer is liable for failing to intervene only "if there [was] a realistic and reasonable opportunity to intervene." *Smith v. Mensinger*, 293 F.3d 641, 651 (3d Cir. 2002). It is the plaintiff's burden to adduce evidence showing that the officer had such an opportunity. *Id.*

Here, even if intervention were warranted, which is assumed *arguendo*,[10] there was no reasonable and realistic opportunity for Officer Correa to do so. According to Plaintiff's girlfriend, Officer Correa was in the bedroom with her at the time of the incident. Plaintiff has offered no evidence that Officer Correa observed or heard the struggle from her vantage point in the bedroom, which was a short distance from the front door. Even if she had, Plaintiff has not offered any facts suggesting that Officer Correa had reason to know that Agent Edge was allegedly about to make the split second decision to strike Plaintiff, or that she could realistically

---

[10] As an alternate and independent ground, because this Court has found that Agent Edge's use of force was lawful, Plaintiff's claims against Agent Egbert and Officer Correa for failing to intervene in the use of that force necessarily fail. *See, e.g., Abrahante v. Johnson*, Civ. No. 07-5701, 2009 WL 2152249, at *8 (D.N.J. July 14, 2009) ("a failure to intervene claim cannot lie without an alleged constitutional violation"); *Bodnar v. Wagner*, Civ. No. 07-2038, 2010 WL 56097, at *4 (M.D. Pa. Jan. 5, 2010) ("if there was no use of excessive force in effectuating [plaintiff's] arrest, then there could likewise be no claim for failing to intervene").

have reached the front door in time to prevent Plaintiff from being struck, an action that occurred, in Plaintiff's own words, "very quick."

Although Agent Egbert was in closer proximity to the front door and witnessed the struggle, it is undisputed that he was in the process of subduing Plaintiff's brother at the time Plaintiff was struck. It was not realistic for Agent Egbert to then leave Plaintiff's brother unattended. Moreover, this is not a case of an ongoing assault that Agent Edge witnessed but failed to stop; rather, Plaintiff was struck quickly only for a short duration with minor force, if he was struck at all. Finally, Plaintiff testified that only seconds after he was hit, the "big guy" with the U.S. Marshal's badge grabbed Agent Edge and pushed him off Plaintiff. Plaintiff does not explain how Agent Egbert realistically could have intervened to prevent the use of force when it lasted but a few seconds, and another member of the Fugitive Task Force had already intervened seconds after it occurred. In light of the speed with which these events transpired, the Court finds that there was no realistic or reasonable opportunity for Agent Egbert to intervene. *See La v. Hayducka*, 269 F. Supp. 2d 566, 581-82 (D.N.J. 2003) (finding that it was unrealistic to assume defendant had reasonable opportunity to intervene, even though parties were in "close proximity," due to rapid nature of events and "tense and dangerous" situation); *see also O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1998) (no duty to intervene where "three blows were struck in such rapid succession that [officer] had no realistic opportunity to prevent them"). The Court will therefore grant Agent Egbert's and Officer Correa's motions for summary judgment on the failure to intervene claim, finding that qualified immunity applies to this claim as well.

### F. Deliberate Indifference To Plaintiff's Medical Needs

Plaintiff alleges that his rights under the Fifth, Eighth, and Fourteenth Amendments were violated by the FBI Defendants' "wanton deliberate indifference" to his "obviously serious

medical needs." While Plaintiff sustained a laceration under his hairline and an injured toe during the arrest, it is undisputed that he received medical treatment for these injuries about three-and-a-half hours after his arrest. Plaintiff argues that his constitutional rights were violated because of this delay in receiving treatment.

"Delaying medical care to an individual in police custody can constitute a constitutional violation . . . only if that delay 'rises to the level of deliberate indifference to that person's serious medical needs.'"[11] *Mantz v. Chain*, 239 F. Supp. 2d 486, 504 (D.N.J. 2002) (quoting *Groman v. Twp. of Manalapan*, 47 F.3d 628, 637 (3d Cir. 1995)). This standard requires plaintiff to prove that (1) his medical needs were "objectively serious;" and that (2) defendants exhibited "deliberate indifference" to those needs. *See Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987). Where, as here, "plaintiff alleges only a delay in calling for emergency medical assistance, and not an outright denial of medical care, the 'objective seriousness of the deprivation should . . . be measured by reference to the effect of the delay in treatment.'" *Mantz*, 239 F. Supp. 2d at 504 (quoting *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (8th Cir. 1995)). That is, a plaintiff complaining of a delay in medical treatment "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Beyerbach*, 49 F.3d at 1326; *see also Mantz*, 239 F. Supp. 2d at 504 (plaintiff must provide "medical evidence, beyond his own subjective testimony, that [the] alleged delay . . . caused him to suffer harm which he would not have suffered had an ambulance been immediately called to the scene"). Even where medical treatment was delayed for many

---

[11] The Eighth Amendment does not apply to a pretrial detainee like Plaintiff. Rather, Plaintiff's claim is appropriately analyzed under the Due Process Clause of the Fifth Amendment. *Harvey v. Chertoff*, 263 F. App'x. 188, 191 (3d Cir. 2008). Nonetheless, the Third Circuit has "found it constitutionally adequate to analyze pretrial detainees' claims of inadequate medical care under the familiar deliberate indifference standard," which is often applied in Eighth Amendment cases. *Id.*; *see also Hill v. Algor*, 85 F. Supp. 2d 391, 409 (D.N.J. 2000) (applying deliberate indifference standard to arrestee's claim of failure to provide medical care while in custody).

hours or even days, courts have found summary judgment appropriate where the plaintiff has failed to adduce evidence that that delay exacerbated his injury. *See, e.g.*, *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 207-08 (1st Cir. 1990) (affirming summary judgment where there was "nothing in the record to suggest" that a ten-hour delay in medical treatment exacerbated plaintiff's injuries "in the slightest"); *Evans v. Rozum*, Civ. No. 07-230J, 2009 WL 5064490, at *6 (W.D. Pa. Dec. 17, 2009) (granting summary judgment because plaintiff "failed to adduce any evidence of additional harm caused by the delay of 96 hours").

Here, Plaintiff has adduced no medical evidence of any kind that the three-and-a-half hour delay in receiving treatment exacerbated the cut to his head or the bruise to his toe. Without this evidence, Plaintiff cannot establish that the delay was sufficiently serious to cause Plaintiff additional harm, and, accordingly, cannot establish that the FBI Defendants were deliberately indifferent to his medical needs. Plaintiff's injuries were not serious and the few hours between injury and treatment do not set forth any plausible basis for a deliberate indifference claim. *See, e.g.*, *McGovern v. City of Jersey City*, Civ. No. 98-5186, 2006 WL 42236, at *8 (D.N.J. Jan. 6. 2006) (granting summary judgment where plaintiff did not proffer any evidence that delay in medical treatment exacerbated injuries); *Mantz*, 239 F. Supp. 2d at 504-05 (same). Because Plaintiff has failed to point to any evidence of a constitutional violation, qualified immunity protects each of the FBI Defendants from suit on Plaintiff's denial of medical care claim. Summary judgment is therefore appropriate.

### G. Racial Remark

Plaintiff does not oppose Officer Correa's motion for summary judgment on his "racial remark" claim, or list it as one of the legal issues for trial in the Final Pre-Trial Order; therefore Plaintiff is no longer pursuing a constitutional claim arising out of the "racial remark" allegedly made by Officer Correa. In any event, the utterance of racial epithets alone, while unprofessional, does not amount

to a constitutional violation. *See, e.g.*, *Doughty v. Comunale*, Civ. No. 03-2012, 2009 WL 304463, at *3 (D.N.J. Feb. 5, 2009) (officer's use of racially offensive language did not give rise to Section 1983 claim); *Freeman v. Arpaio*, 125 F.3d 737, 738 (9th Cir. 1997) (verbal abuse directed at ethnic background does not state a cognizable constitutional violation). Summary judgment in favor of Officer Correa is therefore granted on this unopposed claim.

### III. CONCLUSION

For the reasons set forth herein, the Court will grant the motions for summary judgment filed by Defendants Stephen E. Egbert, William J. Edge, Jr., and Mark Allan Corrice, and by Defendants Christine Beers Correa and Todd Frey in full. An appropriate Order will issue.

/s/ *Faith S. Hochberg*
**Hon. Faith S. Hochberg, U.S.D.J.**